[Civ. No. 3296.   Third Appellate District.—September 7, 1927.]

SIMON NEWMAN COMPANY (a Corporation), Respondent, v. FRANK P. WOODS et al., Appellants.

362

Thos. M. Anaya for Appellants.

C. W. Croop and Goldman & Altman for Respondent.

GLENN, J., *pro tem.*—This is an action brought to foreclose a chattel mortgage dated October 31, 1923, executed by defendants to plaintiff, and covering certain cattle, horses, and farming implements. The chattel mortgage was given to secure the payment of a promissory note of even date therewith, for the sum of $1,900, also executed by defendants. The answer of defendants admits the execution of the note and mortgage, as well as the fact that nothing has been paid thereon, either by way of principal or interest, but denies that there is due or owing or unpaid to plaintiff thereon the said sum of $1,900, or any other sum. This denial is based upon the alleged facts, pleaded as a special defense and also by way of cross-complaint, the substance of which is to the effect that one Tom Woods, brother of defendant Frank P. Woods, had been falsely accused by the plaintiff and its agents and employees of the crime of embezzlement, and that the note and mortgage were executed by defendants by reason of such threatened arrest and prosecution and on the understanding that he would not be so prosecuted, and that the whole transaction was, therefore, void as contrary to public policy.

Two questions were presented to the jury, called at the request of defendants, as follows: 1. Was there any consideration received by the defendants, or either of them, for the note and mortgage executed by defendants to plaintiff? 2. Was the consent of defendants, or either of them, to the execution of the note and mortgage to plaintiff obtained by threats to arrest, imprison, and prosecute Tom Woods, brother of Frank P. Woods, for embezzling or stealing goods belonging to the Simon Newman Company? The answer of the jury to each question was favorable to defendants, the first being answered in the negative and the second in the affirmative.

The court refused to adopt the verdict of the jury, but made its findings in favor of the plaintiff on all issues. Appellants present their contention as follows: "There is just one issue in this case. Was there an abuse of trial court's conceded discretionary power of setting aside the verdict of the jury—this being a case in equity? We answer in the affirmative and in support thereof quote the following: In chronological order, we shall present the facts and testimony recorded at the trial which we deem sufficient to establish one thing, namely, that said note and mortgage were executed under extortion, duress, and undue influence and that the entire transaction is against public policy and therefore, the court did abuse its discretionary power in rejecting the verdict."

The rule, as conceded by appellants, is well settled that where the case is in equity the verdict of the jury is merely advisory to the court. (*Sweetzer* v. *Dobbins*, 65 Cal. 529 [4 Pac. 540]; *Sullivan* v. *Royer*, 72 Cal. 246 [1 Am. St. Rep. 51, 13 Pac. 655].) The foreclosure of a mortgage is a proceeding in equity, and, therefore, the verdict of the jury was merely advisory. (*Downing* v. *Le Du*, 82 Cal. 471 [23 Pac. 202]; *Van Valkenburg* v. *Oldham*, 12 Cal. App. 572 [108 Pac. 42]; *Coghlin* v. *Quartararo*, 15 Cal. App. 662 [115 Pac. 664].)

The verdict of the jury being advisory, this court will not disturb the findings of the trial court if there is substantial evidence supporting the same. It is true, as stated by appellants, that the court cannot *arbitrarily* set aside the verdict of the jury; but the action of the court in disregarding the verdict cannot be characterized as "arbitrary," if its findings are substantially supported by the evidence. In its last analysis, therefore, the contention of appellants to the effect that the court abused its discretionary power in setting aside the verdict of the jury is merely tantamount to a statement that the findings are not supported by the evidence.

The main contention is that the note and mortgage were given as a result of threats of prosecution against Tom Woods, and we shall take up this proposition first, discussing later the subject of want of consideration, incidentally adverted to in appellants' closing brief.

The assertion that the trial court abused its discretionary power in disregarding the verdict of the jury is attempted to be substantiated by a reference to various parts of the testimony of witnesses called in defendants' behalf, but the testimony of witnesses called on the other side, contradicting and conflicting with that offered by the defense, is but slightly referred to.

It is the province of the trial court, in the exercise of a sound discretion, to determine the facts, where such conflict exists; hence, we shall give in substance and effect an outline of some of the testimony which doubtless influenced the court in the conclusion it reached, treating them as established facts in the case, as we must in view of the findings being favorable to plaintiff.

The plaintiff conducted a mercantile business, and Tom Woods, brother of defendant Frank P. Woods, was, on the thirty-first day of October, 1923 (the date of the execution of the note and mortgage), and for approximately four years prior thereto had been, a clerk in one of the departments thereof. R. E. La Posea and his wife were employed by said plaintiff to conduct an investigation as to the running of the business of said firm and to ''test'' the honesty of the various employees thereof. With this in view certain purchases were made by them from Tom Woods, in payment for which they had tendered him certain marked money. Although a cash register had been provided by the firm on which he was to ''ring up'' sales so made, he had not done so but had placed the money in his pocket. When confronted the next day with these facts he admitted he had taken the money tendered in payment for the goods and had been so doing for a period of several years. The marked money was voluntarily returned by him to the firm and a written confession was freely signed by him to the effect that he had stolen from the firm at the rate of four dollars per day for 600 days, making a total of $2,400. He admitted, at first, that the amount taken was ten dollars per day, and then stated it was six dollars per day, but later said it would be impossible to raise the full amount he had taken, so, at his suggestion, the amount was lowered to four dollars per day. After the confession had been signed and witnessed Tom Woods, accompanied by Mr. and Mrs. La Posea, went to the former's home, where he gathered up a

quantity of merchandise which had been taken from the plaintiff corporation. This was likewise returned to the owner. After the confession was signed, Tom Woods stated that he did not desire to tell his wife about the matter, but upon being urged to do so he stated, ''Well, I think I had better, because she has money, she has some diamonds, and I am sure that we can realize money on and pay this up,'' and, at his suggestion, his wife was sent for. When Mrs. Woods arrived she was informed that her husband had been embezzling from the plaintiff; she stated that she thought she would be able to straighten the matter up, but when her husband stated that she had her diamonds with which to make restitution, she said she didn't think she could raise $2,400 on them and then said, ''In a little place like this, if I start to ask about my diamonds, I don't know, they will certainly know something is wrong; I have no one to go to to get this money.'' Mrs. Woods then asked Mrs. La Posea if the latter knew of anyone to whom she could take the diamonds, and was informed that while she, Mrs. La Posea, knew of no one in Newman, she did know a business man in Modesto. After some conversation between these parties the diamonds were given by Mrs. Woods to Mrs. La Posea to be taken to Modesto for appraisal. An appointment was then made for Mr. and Mrs. Tom Woods to go to Modesto on the following Sunday, the conversation above referred to having taken place on Friday, to ascertain the value of the diamonds and what amount they might be able to realize thereon. Although neither Mr. nor Mrs. La Posea had met the defendant Frank P. Woods, nor mentioned his name in the conversation on Friday, yet when Tom Woods and his wife called at the hotel in Modesto, pursuant to the previous understanding, they were accompanied by said defendant. When the parties met in Modesto they were informed by Mrs. La Posea that the diamonds were worth $750 for a loan and for a sale about $850. The jewelry was then returned to Mrs. Tom Woods. Frank P. Woods then spoke up and said, ''I am not going to have Tom in the store; it is not a man's business''; he also said, ''I am going to take him on the ranch, that is where he belongs. . . . I am going to settle all this trouble with a chattel mortgage on my stock.'' Mrs. La Posea attempted to dissuade said defendant from mortgaging his stock.

Neither Mr. La Posea nor his wife brought up the subject of Frank P. Woods executing a note and mortgage to make good for the brother, nor made any threats of any kind; likewise nothing was said by either of those parties to the effect that if the indebtedness due to the plaintiff was paid, Tom Woods would not be arrested or prosecuted. On the following Monday defendant Frank P. Woods called upon E. J. Morehead, manager of a branch bank at Gustine, and asked the latter for a loan of $1,900, and, in reply to a question from Mr. Morehead as to what use he desired the loan for, defendant replied that it was ''to help his brother out of difficulties that he was having with the Simon Newman Company.'' He was counseled by Mr. Morehead to the effect that it was an unwise undertaking, but the defendant stated that ''he had been helping his family for a good many years, and that he supposed he had it to do again this time.'' He was told that the matter of the loan would be submitted on Tuesday to the finance board of the bank. On the following Wednesday the said defendant again called on Mr. Morehead, for the purpose of ascertaining if the loan had been allowed, and was informed that it had not been allowed. Defendant Frank P. Woods then called upon C. P. Price, office manager of plaintiff. The visit was unsolicited, so far as the latter gentleman was concerned. Defendant inquired as to the probability of securing a loan from Mr. Wagenheim, general manager of plaintiff, and was informed by Mr. Price that the matter would be taken up with the general manager. It was understood that Mrs. Tom Woods was to come to the office of the plaintiff to ascertain for defendant Frank P. Woods the conclusion reached by Mr. Wagenheim. Upon calling at the office she was informed that the plaintiff would accept a mortgage for $1,900 and take Frank P. Woods' note to arrange the loan. In the afternoon of Wednesday, October 31st, Frank P. Woods appeared at the office, and the note and chattel were prepared and signed by him, and a notary public was called in, before whom the mortgage was acknowledged. No threats were made, either by Mr. Price or in his presence, to either of the defendants, to the effect that, unless they signed the note and mortgage, Tom Woods would be arrested and prosecuted for embezzlement, by the Simon Newman Company.

After the defendant Frank P. Woods had executed the note and mortgage he was told to have his wife call, for the purpose of executing the same. On the Saturday following, defendant Mrs. Woods called and signed the note and mortgage, acknowledging the mortgage before a notary.

Without detailing the testimony offered on behalf of defendant it may be said, generally, that Tom Woods denied his guilt; claimed that the confession was secured by means of threats made to him; that his home was ransacked by Mr. and Mrs. La Posea, but that only articles belonging to him, and not to the firm, were found. Frank P. Woods testified that while he had gone to Modesto at the request of his brother he was told while there that unless the money was put up Tom would be prosecuted; that Mrs. Woods had asked the detectives (Mr. and Mrs. La Posea) if the money was put up if they would prosecute Tom, and that Mr. La Posea shouted out "No." He testified also, in substance, that Mr. Morehead at the bank had told him that he was wanted at the Simon Newman store, and that he had no sooner arrived when Mr. Price was there to meet him, who told him that his brother, Tom, had stolen goods and money amounting to $2,400, and that in reply he had said to Mr. Price that if that would save him from being prosecuted he would sign a mortgage, and Price replied: "That is all right, that they would take it up." He further testified that at the time he had signed the mortgage Mr. Price asked him if he knew what he was signing the mortgage for, and he replied, "Yes, I was signing it to keep Tom from being prosecuted," and he, Price, said, "It was right."

Testimony was also given on behalf of defendants as to certain conversations had between them at their home during the interval between the time the husband signed the note and mortgage and the time Mrs. Woods signed the same, to the effect that Frank P. Woods had informed his wife that, unless the note and mortgage were given, his brother would be prosecuted. No mention was made by Mrs. Woods of these purported conversations with her husband, either to the notary public at the time she acknowledged the mortgage or to any person connected with, or in the employ of, the plaintiff corporation. While this line of testimony went in under objection, the findings being in favor of the plaintiff, the question as to the correctness of the ruling of

the trial court thereon has not been presented on appeal, and no discussion thereof is deemed necessary.

The trial court was not bound to accept as true this part of the testimony of defendants merely for the reason that it was not directly contradicted by other witnesses; but the court had the right, and it was its duty, to examine and consider and determine its verity in the light of all the facts and circumstances in the case.

It is conceded that a note or mortgage given on promise to refrain from the prosecution of a person for a felony, or under threats of arrest or prosecution, would be void as against public policy; but whether or not the note and mortgage were so given was a question presented to the trial court for determination. The evidence on the subject was highly conflicting, and the court resolved the conflict in favor of the plaintiff. There is substantial evidence to support its findings in this regard, and hence it is not the province of this court to disturb the same.

The question of whether the findings of the court with reference to the consideration for the note and mortgage finds support in the evidence remains to be considered. In this connection, the court found that the note and mortgage were executed in order to liquidate the obligation of Tom Woods to plaintiff, and further found that there was a good and valuable consideration for the execution of said documents, to wit, the forbearance on the part of plaintiff to sue Tom Woods upon his indebtedness to plaintiff.

Plaintiff offered in evidence the note and mortgage, the execution of which were admitted, together with proof that nothing had been paid thereon, either for principal or interest, and rested.

The defense put in their case along the lines we have before stated, for the purpose of showing that the note and mortgage were given as a result of threats of prosecution directed toward Tom Woods and on the understanding that such threats would not be carried out. There was testimony by the defendants that they had received no consideration for the execution of note and mortgage.

The testimony of the witnesses for the plaintiff in rebuttal was along the lines already indicated, denying the threats and giving a different version of the transaction and

of the various conversations attributed by the defense to them.

A good and sufficient consideration for a written contract will be presumed. (Sec. 1963, subd. 39, Code Civ. Proc.) Hence, by the introduction in evidence of the note and mortgage plaintiff made out a *prima facie* case. Section 1615 of the Civil Code provides: "The burden of proving the want of consideration sufficient to support an instrument lies with the party seeking to invalidate or avoid it." The burden was, therefore, cast upon the defense of overcoming the presumption of consideration.

Under this state of the case the testimony offered on the part of the defense merely raised an issue of fact which was for the tribunal trying the cause to determine. (Secs. 1957, 1963 and 2061, subd. 2, Code Civ. Proc.; *Mar Shee* v. *Maryland Assur. Corp.*, 190 Cal. 1 [210 Pac. 269]; *Keating* v. *Morrissey*, 6 Cal. App. 163 [91 Pac. 677].)

The fact in dispute raised by the presumption still remains one to be determined by the court or jury trying the cause until the presumption is dispelled. (*Mar Shee* v. *Maryland Assur. Corp., supra.*)

Appellants' position seems to be that it was established or proved as a fact in the case by a witness called on the part of the plaintiff itself that there was no valid consideration, and in this connection they rely upon an answer on cross-examination given by the witness Price, called in rebuttal by plaintiff. As some matters explanatory of the answer of the witness so relied upon do not appear in appellants' brief, we quote from the record. "Q. Well, will you state to the jury, Mr. Price, what was the occasion by you, or the Simon Newman Company, of having this mortgage $1,900 and having $500 received from Mrs. Tom Woods. Mr. Goldman: I think that is about seven times that we have stipulated as to what consideration we claim was given, and we don't claim any other consideration. Mr. Anaya: He may have a new one. Mr. Goldman: We don't claim any other consideration, so why waste time on it. The Court: Well, you can state whether or not there was a consideration. The witness: May I ask your Honor just what is meant by 'consideration'? Mr. Goldman: We will object to the question as calling for a conclusion. The Court: The consideration for the $1,900 note. The consideration moving to the

Simon Newman Company. A. What is meant by consideration? The Court: Well, that is the issue in this case, what the court has to decide and what the jury has to decide, but, the consideration for a note is usually money received by a person, or it might be property, or it might be anything. Mr. Anaya: Provided it is a legal, valid consideration. The Court: Well, he asked him if he knew of any other consideration, do you know of any other thing they received? A. I don't know of anything else.''

Concerning the above, appellants state: ''Mr. Price, as manager of the plaintiff corporation, admits he knew of no consideration except that mentioned by the defendants, namely, to save Tom Woods arrest and compound a felony.'' The testimony relied upon is not susceptible of such an interpretation, as the witness had not referred to any fact or circumstance from which such an inference even might be drawn—in fact, his testimony, elsewhere given, was to the opposite effect. The answer of the witness, ''I don't know of anything else,'' was in response to the question: ''Well, *he* asked him if he knew of any other consideration, do you know of any other consideration they received?'' The first sentence appears, by the use of the pronoun ''he,'' to have reference to Mr. Goldman, counsel for plaintiff; the second sentence, which in fact composed the question, was addressed to the witness; but an analysis of the preceding discussion between court and counsel leads to the conclusion that the remark of the court was addressed to Mr. Anaya, counsel for defendants, the pronoun ''he'' being either a typographical error or having been used inadvertently and the question being framed to meet a suggestion made by him. As the witness was under cross-examination by Mr. Anaya, and as Mr. Goldman was asking no questions, it is apparent that the remark of the court did not refer to the latter. While the initial question asked by Mr. Anaya did not refer to or mention directly the subject of ''consideration,'' seemingly it was so understood by Mr. Goldman for, immediately following, a remark was interpolated by him to the effect that they had several times stipulated as to what consideration they claimed was given, and they did not claim *any other consideration;* to which Mr. Anaya replied: ''He (the witness) may have a *new one.*'' This remark of Mr. Anaya, considered in connection with what immediately

preceded it, carried the suggestion that the latter desired the witness to state the consideration *other than the one referred to by Mr. Goldman.* The reply of the witness is responsive to the question asked and seems to indicate that he had in mind *some* consideration, but knew of nothing "else." The form of the question presupposed the prior mention of a specific consideration, and he was asked, in effect, to state the consideration "other" than that previously mentioned; but as no specific consideration had been previously mentioned, and as the witness was not further interrogated on the subject, the meaning of his answer is left to conjecture. It may be well here to note that the record, notwithstanding the statement of Mr. Goldman to the contrary, as noted above, does not disclose any stipulation with reference to consideration, and neither counsel has so claimed. Under these facts we are left in the dark as to the specific consideration intended to be referred to by the witness or by the court or counsel. The subject of forbearance of suit on the indebtedness of Tom Woods had not been mentioned to the witness, and it is doubtful if he had knowledge of the fact that such a detriment, suffered by plaintiff, in consideration of the execution of the note and mortgage by defendants, would furnish a sufficient consideration to support the same. The answer of the witness, as we have analyzed it, appears to be favorable to the respondent, but even if considered otherwise, it falls far short of establishing the fact of want of consideration as against the presumption of a valid consideration, for the rule is well settled that a presumption is not dispelled and does not disappear from the case by testimony of such vague and uncertain meaning.

In the case of *Mar Shee* v. *Maryland Assur. Corp., supra,* the court, speaking to the point as to when a fact is "proved" contrary to a presumption, says: "From the foregoing we deduce that a fact is proved as against a party when it is established by the uncontradicted testimony of the party himself, or of his witnesses, under circumstances which afford no indication that the testimony is the product of mistake or inadvertence; and that when the fact so proved is wholly irreconcilable with the presumption sought to be invoked, the latter is dispelled and disappears from the case."

The case of *Keating* v. *Morrissey, supra,* is analogous to the instant case, and many of the questions involved herein will be found fully discussed in that case.

Appellants complain of the action of the trial court in refusing an instruction proposed by them; but as the verdict of the jury was favorable to them, although subsequently disregarded by the court, no useful purpose would be subserved by a discussion of the matter.

The findings of the court are amply sustained by facts and circumstances of the case, and the judgment is, therefore, affirmed.

Plummer, J., and Finch, P. J., concurred.